**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
HELENA DAVID,

                        Plaintiff,

          - against -

COMTECH PST CORPORATION, et al.,

                      Defendants.
----------------------------------------------------------X

**ORDER**

CV 03-6480 (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Plaintiff Helena David ("David") accuses five defendants – her former employer Comtech

PST Corporation ("Comtech"), together with four of Comtech's officers and employees – of

discriminating against her on the basis of her age and gender in the course of her employment, in

violation of federal and state laws, and of denying her right to equal pay regardless of sex.  *See*

docket entry ("DE") 11 (Amended Complaint).  The defendants seek dismissal of all of David's

claims pursuant to Federal Rule of Civil Procedure 56.  DE 27-1.  David has cross-moved for

summary judgment solely with respect to her equal pay claims.  DE 25-1.  For the reasons

explained below, I grant summary judgment in favor of the defendants on the gender

discrimination claims but deny the motions in all other respects.  As a result, David's age

discrimination and equal pay claims will proceed to trial.

I.    <u>Background</u>

      A.    <u>The Parties' Submissions</u>

      The parties have filed a number of briefs, affidavits, and other papers in support of the

two motions before me, as summarized below, all of which I have considered.

1.      The Defendants' Submissions

| DE # | Abbreviation | Description |
|---|---|---|
| 27-1 | "Comtech Notice" | Notice of Motion for Summary Judgment |
| 27-2 | "Nathan Aff. I" | Affirmation [of Bernard A. Nathan] in Support of Motion dated June 21, 2005 |
| 27-3 | "Compitello Aff. I" | Affidavit [of Linda Compitello] in Support of Motion dated June 17, 2005 |
| 27-4 | "Konopelko Aff." | Affidavit [of Larry Konopelko] in Support |
| 27-5 | "Comtech Memo." | Memorandum of Law in Support of Defendants' Application for Summary Judgment Dismissing the Complaint |
| 27-7 | "Nathan Aff. II" | Affirmation [of Bernard Nathan] in Support of Motion dated September 22, 2005 |
| 27-8 | "Compitello Aff. II" | Affidavit [of Linda Compitello] in Reply and in Opposition to Cross-Motion dated September 21, 2005 |
| 27-9 | "Comtech Stmt." | Amended Rule 56.1 Statement |
| 27-10 | "Comtech Counter Stmt." | Counter Rule 56.1 Statement: Additional Facts by Defendant in its Counter Statement of Facts |
| 27-11 | "Comtech Reply" | Defendants' Memorandum of Law in Reply to Plaintiff's Opposition to Defendants' Application for Summary Judgment Dismissing the Complaint and in Opposition to Plaintiff's Cross-Motion for Summary Judgment |
| 27-13 | "Compitello Aff. I Ex. __" | Exhibits A-O to Compitello Aff. I |
| 27-15 | "Compitello Aff. II Ex. __" | Exhibits A-C to Compitello Aff. II |

### 2. The Plaintiff's Submissions

| DE # | Abbreviation | Description |
|------|-------------|-------------|
| 25-1 | "David Notice" | Plaintiff's Notice of Cross-Motion and Cross-Motion for Partial Summary Judgment |
| 25-2 | "Slavin Aff. I" | Affirmation [of Linda Slavin] in Opposition to Defendants' Motion and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment dated July 25, 2005 |
| 25-3 | "David Memo." | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment; |
| 25-4 | "David Aff. I Ex. __" | Exhibits A-L to David Aff. I |
| 25-5 | "David Aff." | Affidavit [of Helena David] in Opposition to Defendants' Motion and in Support of Cross Motion for Partial Summary Judgment dated July 25, 2005 |
| 25-6 | "David Stmt." | Plaintiff's Rule 56.1 Counter-Statement of Facts and Additional Omitted Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment |
| 25-7 | "Slavin Aff. II" | Reply Affirmation [of Susan Slavin] in Further Support of Plaintiff's Cross-Motion for Partial Summary Judgment dated October 14, 2005 |
| 25-8 | "David Reply" | Plaintiff's Reply Memorandum of Law in Further Support of the Cross Motion for Partial Summary Judgment |
| 25-9 | "Slavin Aff. II Ex. __" | Exhibits A-C to Slavin Aff. II |

### B. Facts

Unless otherwise noted, the following facts are undisputed. Comtech is one of six wholly-owned subsidiaries of Comtech Telecommunications Corp. ("CTC"), a New York-based corporation that designs and manufactures telecommunications products. *See* Slavin Aff. Ex. K

(Comtech fiscal year 2002 annual report). Comtech is the only entity within a component of CTC known as the RF Microwave Amplifier Business Segment. *Id*. at 30. As the name apparently suggests (to someone with the requisite technological background), Comtech manufactures and markets amplifiers that reproduce radio signals with increased power and amplitude. The many civilian and military applications of these amplifiers include medical testing, air-to-ground satellite communications, wireless telecommunications systems, and instrumentation. *Id*. at 2, 5-6. Defendants Larry Konopelko ("Konopelko"), Linda Compitello ("Compitello"), and Kurt Berlinghorf ("Berlinghorf") were all employees of Comtech during the events at issue in this suit. Konopelko was Comtech's President, Compitello was the Human Resources Manager, and Kurt Berlinghorf was the Director of Supply Chain Management. Compitello Aff. I ¶ 9; Konopelko Aff. ¶ 8. Defendant Fred Korberg ("Korberg") was the Chief Executive Officer and Chairman of the Board of CTC during the relevant time period. Compitello Aff. I ¶ 9.

### 1. David's Work For Comtech

In April, 1995, Comtech hired David, who was then 72 years old, to work as a buyer in its purchasing department on an independent contractor basis at a wage of $14 per hour. On August 12, 1996, after David's supervisor had recommended her for permanent employment, Compitello approached David about working for Comtech as a regular employee. Comtech Stmt. ¶¶ 4-5. That same day, David executed an employment agreement documenting the terms of her employment including her hourly wage ($14 per hour), vacation accrual, and medical and other fringe benefits. Slavin Aff. I Ex. E (excerpts of David's personnel file). David's supervisor at the time of her hire and throughout her employment at Comtech was David Ciringione

("Ciringione"), who was the head of the purchasing department and who is approximately nine years younger than David. Comtech Stmt. ¶¶ 7, 24.

David's basic function as a buyer was to purchase parts that were needed to manufacture telecommunications devices from vendors. David would receive purchase requisitions from Comtech's planners, contact vendors for price quotes, determine which vendors to use, and then prepare handwritten purchase orders. David Dep. at 59. A secretary would then type up David's handwritten orders and David would mail the typed orders to the vendors. *Id.* at 63. In a dispute of some importance to the disposition of the instant motions, the parties disagree as to the specific types of items that David purchased for Comtech. David claims she purchased both electronic items like transformers, compositors, and resistors, and also mechanical items such as sheet metal and plastics. David Stmt. ¶ 4; David Dep. at 46-47, 57-58; David Aff. ¶ 3. The defendants claim that David was hired as an electronic buyer and that she did not purchase mechanical items. Comtech Stmt. ¶ 4; Compitello Aff. I ¶ 11.

David's performance reviews suggest that she was an exemplary employee. At each of her five annual performance reviews she received an overall rating of four on a five-point scale. Her first evaluation, which took place some eight months after she was hired as a permanent employee, produced the comment that she was "very good – above standard." Each of the next four reviews used the term "excellent" to describe her overall performance. Slavin Aff. I Ex. F (David's annual performance reviews for 1997-2002). At David's final performance review in April 2002, approximately six months before she was terminated, the evaluator noted that David's computer skills were improving. Slavin Aff. I Ex. F. After each performance review, David received a merit-based raise. Compitello Aff. I ¶ 13; Slavin Aff. I Ex. E.

## 2.    Other Comtech Buyers

When David was hired, there was one other buyer in the purchasing department, a male employee named David Balfoort ("Balfoort").  Balfoort had been working for Comtech since April 21, 1988 when he was hired as a "Junior Buyer" at a starting wage of $9.616 per hour. Balfoort was promoted from Junior Buyer to Buyer in November, 1989, and his position remained Buyer until his promotion to Senior Buyer in May, 1995.  In the final year of his tenure as a Buyer, Balfoort made $14.49 per hour.  At the time of David's permanent hire, Balfoort was 35 years old, he had already been promoted to position of Senior Buyer, and his salary was $18.8142 per hour.  Balfoort resigned from Comtech on February 12, 1999.  Compitello Aff. I Ex. K (Balfoort salary history).

During David's tenure, two other individuals joined the purchasing department as buyers: a female named Sharon Marcus ("Marcus") and a male named George Bantleon ("Bantleon"). Marcus was internally promoted to a buyer position from another department on June 9, 1997, at which time she was 47 years old and her starting salary – like David's at the start of her tenure – was $14 per hour.  Slavin Aff. Ex. H (Marcus salary history).  Bantleon was hired almost exactly a year later, on June 8, 1998, and, like David, was assigned to the purchasing department and reported to Ciringione.  Unlike David, he had the title of Mechanical Buyer and a starting wage of $17.125 per hour.  Compitello Aff. I ¶ 14, Ex. I.

In contrast to Marcus, Bantleon was not promoted from within.  At the time he applied for a position with Comtech approximately two weeks before he was hired, Bantleon was making $16.25 per hour as a Senior Buyer at Sonicor Instrument – almost a dollar per hour more than the $15.2884 that David was then earning.  Compitello Aff. I ¶¶ 14-15, Exs. G, I.  The defendants

claim that Bantleon's starting salary was based on the amount necessary to induce Bantleon to leave his job at Sonicor. Compitello Aff. I ¶ 16.

Bantleon, like David, received annual raises each year from 1999 through 2002. Compitello Aff. I Ex. I. Measured as a percentage, David's respective raise was slightly larger than Bantleon's during each of the four years that they both worked at Comtech: David's merit raises ranged from 3.7 to 4.7 percent whereas Bantleon's ranged from 3.4 to 4.4 percent. Compitello Aff. I ¶ 17. Despite David's marginally higher annual raises, Bantleon's salary remained higher than David's by approximately $2 per hour throughout their overlapping tenure with Comtech. *See id*. Ex. I (salary histories of David and Bantleon).

3.     <u>Similarities And Differences Among The Buyers' Jobs</u>

The parties have an important disagreement about how best to characterize the jobs held by David, Marcus, and Bantleon, respectively. They agree that all three employees worked as buyers in the purchasing department and that they reported to the same supervisor. Beyond that, their descriptions diverge. The defendants claim that David's position was not the same as either Bantleon's or Marcus's, albeit for different reasons in each case. David asserts that her job was comparable to that held by each of these colleagues.

The defendants differentiate between David and Bantleon by describing the latter as a mechanical buyer and the former as an electronics buyer. Compitello Aff. I ¶ 14. David agrees that Bantleon was a mechanical buyer but argues that she purchased both mechanical and electronic items. *Compare* Comtech Stmt. ¶¶ 4, 9 *with* David Stmt. ¶¶ 4, 9. The parties agree on the essential distinction between the two positions: a mechanical buyer has to read blueprints and negotiate prices with vendors whereas an electronics buyer does not. Comtech Counter

7

Stmt. ¶ 37; David Stmt. ¶ 37. Comtech's job descriptions for the two positions makes the distinction plain. The "Electronic Buyer" job description lists ten tasks; the "Mechanical Buyer" job description lists the same ten tasks but also adds an eleventh: "Reads [blueprint] drawings for requisitioned materials, determines the appropriate source of supply, reviews vendor responses for possible cost saving suggestions and processes these charges to Engineering and Drafting." Slavin Aff. I Ex. C. David claims that before Bantleon was hired, she worked as a mechanical buyer, in which capacity she had occasion to read blueprints, and that even after Bantleon's arrival she had occasion to do so. David Aff. ¶¶ 4, 10. David's employment agreement, like each of her annual performance reviews, refers to David's position as simply "Buyer;" in contrast Bantleon's salary history identifies his position as "Mechanical Buyer." *See* Slavin Aff. I Exs. E-F, I.

With respect to Marcus, the defendants claim that she performed a function known as "outsourcing" that required her to contract outside vendors to assemble electronic components whereas David only purchased parts from vendors. Compitello Aff. II ¶ 5.[1] David says that she and Marcus performed substantially similar buying tasks. David Aff. ¶¶ 6-7. Like David, Marcus is listed as a "Buyer" in the salary history documents from the relevant period. *See* Slavin Aff. I Ex. H.

---

[1] David asks that I disregard Compitello's final affidavit on the ground that it contradicts her former testimony. The assertion cited here, at least, does not contradict any sworn statement by Compitello in the record before me. To the extent that David objects to Compitello's statement on the ground that they are self-serving, I may not make such a credibility assessment in determining a motion for summary judgment. *See Hetchkop v. Woodlawn at Grassmere, Inc.* 116 F.3d 28, 33 (2d Cir. 1997) (citations omitted); Fed. R. Civ. P. 56(e) Advisory Committee Note (1963). Finally, the fact that Compitello's statements are sworn and made on an assertion of personal knowledge renders unavailing David's objection under Fed. R. Civ. P. 56(e).

4.    Comtech's Changing Financial Condition And David's Termination

In the Spring of 2001, as a result of acquiring a new product line from a competitor called MPD Technologies, Inc. ("MPD"), Comtech anticipated boosting its annual sales to $30 million. Comtech Stmt. ¶ 14; Konopelko Aff. ¶¶ 3-4. Following the terrorist attacks on this country on September 11, 2001, which the defendants claim had an adverse impact on their sales, that $30 million benchmark became impossible to achieve. It was for this reason, the defendants assert, that Comtech laid off several employees, including Marcus, in November, 2001. Comtech Stmt. ¶ 6; Konopelko Aff. ¶ 6. David concedes that Comtech's sales did not reach the anticipated $30 million mark and that the company had a reduction in force in November 2001, but cites CTC's financial records to argue that the September 11 attacks affected a different subsidiary, not Comtech. David Stmt. ¶ 16 (citing CTC's fiscal year 2002 annual report).

In June 2002, Comtech learned that it had not been awarded an important contract that it had expected to secure from Honeywell Corporation. Konopelko Aff. ¶¶ 7-8. Konopelko testified that he and Berlinghorf met the following month to discuss the effect of the lost contract and decided that they would have to lay off additional employees and restructure certain departments, including the purchasing department, to reduce overall costs and improve operational efficiency. Comtech laid off a number of employees in July, 2002. Konopelko Aff. ¶¶ 8, 10; Comtech Stmt. ¶¶ 17-18.[2]

_____

[2]    David argues that the defendants' motion should be denied because their memorandum of law and Rule 56 statement failed to include citations to admissible evidence. David Memo. at 25. It is true that the defendants' initial Rule 56 statement did not contain any such citations. *See* DE 27-6. David's counter-statement did not dispute the defendants' assertions about the July meeting described above, but instead merely noted that she could neither admit nor deny the allegation because she had received no information about it during the course of discovery David Stmt. ¶¶ 17-18. The defendants amended their Rule 56 statement by adding the requisite citations to

David disputes Comtech's claim of poor fiscal health. She notes that according to its annual reports, the company actually had increased revenues relative to prior years during both the fiscal year in which David was fired (2003) and the preceding year (2002). David Stmt. ¶¶ 16, 35. For the fiscal year that ended three months before David was fired (2002), the CTC segment that consists entirely of its subsidiary Comtech reported a 39 percent increase in sales from the prior year. Slavin Aff. I Ex. K at 15. For the fiscal year in which David was fired, that same segment reported a 2.2 percent increase. *Id*. Ex. L at 16. The defendants acknowledge those gains, but assert that they mask the fact that sales were nonetheless considerably less than anticipated. Comtech Reply at 7 (citing Konopelko Aff. ¶ 6).

Plaintiff and Bantleon were both fired on October 18, 2002. Upon their termination, Ciringione – their erstwhile supervisor – assumed the duties of both. Compitello Aff. I ¶ 22; Slavin Aff. II Ex. C (deposition of David Ciringione dated February 10, 2005) ("Ciringione Dep.") at 19. After Bantleon and David were terminated, Ciringione no longer had any employees under his supervision. *Id*. at 33.

5.    Additional Employees Hired Before And After David Was Fired

In or around February, 2003, Comtech hired Robert Lehmannn ("Lehmannn") on a part-time basis. Ciringione Dep. at 18; Compitello Aff. I Ex. M (deposition of Kurt Berlinghorf) ("Berlinghorf Dep.") at 29. Lehmann was made a full-time employee on June 30, 2003, at which time he was 44 years old. His starting salary was $22.1153 per hour. Compitello Aff. I Ex. O

Konopelko's affidavit – which, like all of the evidence upon which the defendants' motion and Rule 56.1 statement relied, the defendants had served on David's counsel with their original motion papers on June 30, 2005. *See* Comtech Stmt.; DE 17. David has therefore suffered no prejudice from the initial failure to cite the evidence that she in any event had. As a result, I overrule her objection and resolve the matters before me on their merits.

Lehmannn was hired primarily to perform buying tasks.  Compitello Aff. I ¶ 24, Ex. N
(deposition of Robert Lehmann) ("Lehmann Dep.") at 39; Ciringione Dep. at 18.  After he was
hired, Lehmann assumed responsibility for computerizing Comtech's purchasing processes.
Purchase requisitions and purchase orders are now completed entirely online.  Comtech Stmt.
¶ 30; Lehmann Dep. at 43, 51, 52.  In addition, Lehmann created an electronic database of
vendor-specific pricing information, which had previously been maintained in a card file.  These
changes were proposed and implemented entirely after Lehmann was hired.  Lehmann Dep. at
51-52.

On September 30, 2002, three weeks before David and Bantleon were fired, Comtech
hired Philip Cenzano ("Cenzano") to fill the newly-created position of Director of Supply Chain
Management.  In this capacity he oversaw several departments including both purchasing and
planning.  Comtech Stmt. ¶¶ 21, 23.  Lehmann reported to Cenzano.  *Id*. ¶ 27.

Around August, 2005, Comtech hired Glen Henderson ("Henderson"), whom Ciringione
testified to be in his late thirties or early forties at the time.  Ciringione testified that Henderson
was hired primarily as an expediter to follow up with vendors on the status of placed orders  and
could not be classified as a buyer *per se* although he has on occasion performed some buying
tasks.  Ciringione Dep at 21-22.

C.    Procedural History

Prior to filing a complaint in this court, David filed a complaint against the defendants
with the Equal Employment Opportunity Commission ("EEOC") alleging age and gender
discrimination and the denial of equal pay; she filed a similar charge with the New York State
Division of Human Rights.  Complaint ¶ 4, Ex. A.  On October 1, 2003, the EEOC notified

11

David that it was closing her case and informed her of her right to bring a private lawsuit. *Id.*

¶ 5, Ex. B. David exercised that right on December 29, 2003, when she initiated the instant action, claiming that Comtech unjustifiably paid her less than it paid male buyers for substantially similar work, that it unlawfully fired her because of her age, and that the individual defendants shared in Comtech's responsibility for those violations. The defendants submitted a joint answer to David's complaint that generally denied all of her allegations on January 19, 2004. DE 6. On April 6, 2005, the parties reported that discovery was complete and consented to have a magistrate judge conduct all proceedings in this case and to order the entry of judgment pursuant to 28 U.S.C. § 636(c)(1).

II.     Discussion

   A.     Summary Judgment

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In determining whether to grant summary judgment, a court is confined to issue-finding, not issue resolution. *Rasmussen v. Sigma Corp. of Am.*, 27 F. Supp.2d 388, 391 (E.D.N.Y. 1998) (citations omitted). The court does not "weigh the evidence and resolve ... factual issues" but rather "determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir. 1991) (quoting *Gibson v. Am. Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see* Fed. R. Civ. P. 56(c). A fact is material if it "'might affect the outcome of the suit under the governing law.'"

*Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue is presented if "'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Id.* In assessing the evidence, "[a]ll factual inferences are to be resolved in favor of the non-movant." *Transco Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994).

Employment discrimination cases like the instant suit raise unique issues with respect to summary judgment because they often turn on the intent of a party for which there is rarely any direct evidence. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). A trial court should only grant summary judgment in such cases after carefully reviewing the evidentiary record for circumstantial proof to undercut the employer's explanations for its actions. *See id.* That the courts should do so only cautiously does not mean that summary judgment is never appropriate in the discrimination context. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000) ("trial courts should not treat discrimination differently from other ultimate questions of fact") (citations and internal quotation omitted); *Abdu-Brisson v. Delta Air Lines, Inc*. 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). To the contrary, where an employer presents convincing evidence as to the legality of its conduct and the plaintiff presents merely conclusory allegations of discrimination, summary judgment is appropriate. *Stern v. Trustees of Columbia Univ.* 131 F.3d 305, 312 (2d Cir. 1997). To survive summary judgment, the plaintiff must present sufficient admissible evidence to "permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.*

B.    The Title VII And ADEA Claims

1.    Applicable Law

David's claims of unlawful discrimination on the basis of her age and gender arise under a variety of federal and state laws:  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. ("ADEA"), and the New York State Human State Rights Law, § 290 *et seq*. of the New York State Executive Law ("NYSHRL").[3]

Title VII makes it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin."  42 U.S.C.A. § 2000e-2(a)(1) (emphasis added).  The ADEA makes it unlawful for employers to discriminate in any of the aforementioned ways on the basis of an individual's age.  29 U.S.C. § 623(a)(1).  The Act applies to employees who are 40 years of age or older.  *Id.*  The New York Human Rights Law affords similar protection as both Title VII and the ADEA, and is governed by the same legal standards as claims brought pursuant its federal law counterparts.  *See* N.Y. Exec. Law § 296(1)(a) (McKinney 1993); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir.1995) (New York courts require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII); *Lightfoot v. Union*

---

[3]  I include in this category of "unlawful discrimination claims" those claims in which David must affirmatively prove that the defendants were motivated by a discriminatory animus.  Some of David's claims based on the difference between her pay and that of her male colleagues arise under different statutes that do not require proof of such animus.  Although the purpose of the latter statutes, like those addressed here, is unquestionably to combat discrimination and its lingering effects, I address the claims under those laws separately in the next section of this discussion.

*Carbide*, 110 F.3d 898, 913 (2d Cir. 1997) (elements of an age discrimination claim "are essentially the same under the ADEA and the NYSHRL").  The ultimate issue in any federal discrimination claim, and thus discrimination claims brought under the NYSHRL as well, is whether the employer made an adverse employment decision based in whole or in part on an "impermissible reason."  *Fields v. New York State Office of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997).

Title VII and ADEA claims are both governed by the familiar, three-step *McDonnell Douglass* burden-shifting analysis.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (ADEA); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) (Title VII); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (Title VII).  At the first stage of the analysis, the plaintiff bears the burden of establishing a *prima facie* case that creates a presumption of discrimination.  A plaintiff can meet this burden be demonstrating, through direct or circumstantial evidence, four distinct elements:  first, that she is a member of the protected class; second, that she was qualified for the position at issue; third, that she was subjected to an adverse employment; and fourth, that the circumstances suggest that the action was the result of discrimination.  *See Reeves*, 530 U.S. at 142; *Burdine*, 450 U.S. at 248 (citing *McDonnell Douglas*, 411 U.S. at 802).  The plaintiff's burden at this stage is "*de minimis*," *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); she must merely "eliminate the most common nondiscriminatory reasons" for the adverse action.  *See Burdine*, 450 U.S. at 248.  Meeting this threshold burden "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (quoting *Burdine*, 450 U.S. at 254).

15

If the plaintiff succeeds in establishing the presumption, the court proceeds to the second step of the analysis, in which the defendant bears a burden of production with respect to the articulation of a legitimate, non-discriminatory reason for the adverse employment action at issue. *See, e.g.*, *Reeves*, 530 U.S. at 142-143; *McDonnell Douglass Corp.*, 411 U.S. at 802. The purpose of this step is to "force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000) (citation and internal quotation omitted). Although the burden shifts at this stage, it is only with respect to the production of evidence of a legitimate basis for the conduct at issue. The ultimate burden of proving intentional discrimination remains with the plaintiff at all times. *Id*. at 143. The introduction of any admissible evidence from which a trier of fact could conclude that the employer's stated reason was the cause of the adverse employment action taken against the plaintiff satisfies the defendant's burden. *Reeves,* 530 U.S. at 142-143.

Once the defendant articulates a non-discriminatory explanation for its conduct, the presumption of discrimination disappears and "the sole remaining issue" is "'discrimination *vel non*.'" *Reeves*, 530 U.S. at 143 (quoting *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)). The plaintiff must convince the trier of fact to both "*dis*believe the employer" and to believe the plaintiff's theory of intentional discrimination. *Reeves* at 147 (emphasis added). In *Reeves*, the Supreme Court clarified that the plaintiff can meet her burden on this score through a combination of her *prima facie* case and evidence that the defendant's proffered reason was false; that is, the plaintiff need not introduce additional, affirmative evidence of discrimination to survive summary judgment. *Reeves*, 530 U.S. at 148. The Court explained the

various ways that evidence of pretext can help to meet the plaintiff's burden: evidence of pretext can be "quite persuasive" circumstantial evidence of intentional discrimination; can permit a trier of fact to infer "that the employer is dissembling to cover up a discriminatory purpose;" or merely permit the inference that because the employer's explanation was false, discrimination is "the most likely alternative explanation." *Id*. at 147-148.

The holding in *Reeves* does not compel its converse – that is, it does not establish an inflexible rule that would require a court to deny a defendant's motion for summary judgment in any case in which the plaintiff established a *prima facie* case and presented evidence that the employer's explanation for the action at issue is pretextual. *See Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) ("Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."). Whether or not to grant summary judgment in a particular case depends on "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000); *see also Feingold v. New York,* 366 F.3d 138, 152 (2d Cir. 2004); *Roge v. NYP Holdings, Inc*., 257 F.3d 164, 167-168 (2d Cir. 2001).

2.     The Age Discrimination Claims

The defendants concede that David was over 40, that she was qualified for her position, and that she suffered an adverse employment action when she was fired. *See* Comtech Memo. at 4-5. These three facts establish the first three elements of David's *prima facie* case. The only disputed issue is thus whether the circumstances of David's termination give rise to an inference of discrimination. David seeks to meet this burden with evidence that she was replaced by

considerably younger workers. David Memo. at 7-9. The defendants argue that neither of the subsequently-hired employees that David claims replaced her was actually hired to fill her former position and thus that her claim fails at this threshold stage. Comtech Reply at 6-7.

David concedes that immediately after she and Bantleon were fired, Ciringione, their 70-year-old supervisor, assumed responsibility for both of their job functions. But she argues that they were thereafter replaced by Lehmannn and Henderson, who were hired, respectively, four months and three years later. David contends that each of these employees performed buying functions similar or identical to those she performed prior to her termination. David Memo. at 7-9. The defendants argue that neither of these employees was hired as a buyer and that buying tasks comprised only a small portion of each employee's job. They contend that Lehmannn was hired as a "buyer/expediter/planner" to perform a variety of tasks including purchasing, engineering, and computer work, and further note that he was supervised by Cenzano whereas David reported to Ciringione. As for Henderson, they claim that he was hired as an "expediter," not a buyer, and that any buying tasks he performed were merely incidental to his job. Comtech Reply at 5-6.

Although Lehmannn did not report to the same supervisor as David and Bantleon, the record contains substantial evidence that his primary job responsibility both during his temporary employment with Comtech and after his permanent hire was purchasing items needed to manufacture telecommunications items from vendors, including electronics parts. *See*, *e.g.*, Berlinghorf Dep. at 29-30; Lehmann Dep. at 23, 26, 32, 37-39. Ciringione testified that Lehmann was hired to help out with purchasing after the sales volume picked up approximately four months after David was fired and Ciringione could no longer handle all of the purchasing by

himself. Ciringione Dep. at 17-18. Lehmann himself testified that he purchased both mechanical and electronics parts, and that this work constituted about 80 percent of his job. Lehmann Dep. at 38-39. The defendants seek to distinguish Lehmann's position from David's on the basis of his non-buying tasks, which included engineering planning and computer upgrading, and the fact that he reported to a different supervisor than David did. Comtech Reply at 5 (citing Lehmann Dep. at 22).

I find that the conceded overlap between the two employees' job functions creates a question of fact as to whether Lehmann in fact replaced David. Any other result would suggest the existence of a legal rule that defines with some precision the extent to which one employee's duties must differ from those of a previously-terminated plaintiff to satisfy the pertinent element of a discrimination claim, and I am aware of no authority that commits such fine line-drawing to judges as a matter of law rather than to juries.

By contrast, I believe that no comparable question of fact arises with respect to the overlap of duties between Henderson and David if for no other reason than because of the problem that the timing of Henderson's hire poses for David's argument. Henderson was hired nearly three years after David was fired. That a younger employee hired three years after she was terminated has on rare occasion performed tasks similar to those she performed simply does not raise an inference of discrimination. *Lilley v. BTM Corp.,* 958 F.2d 746, 752 (6th Cir.1992) (fact that a younger employee was hired nine months after plaintiff was terminated not probative of age discrimination).[4]

---

[4] In addition, Ciringione testified that while Henderson was an "expediter," purchasing "light" materials such as stationery and toilet paper comprised about ten percent of his job, and that on rare occasions Henderson would purchase parts for manufacturing telecommunications products.

Nonetheless, because David has introduced sufficient evidence to raise a question of fact as to whether the substantially younger Lehmann did in fact replace her, she has satisfied the minimal burden on her at this stage. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (evidence that a plaintiff's duties were assumed by co-workers and thereafter to younger new hires suffices to establish an inference of discrimination). That the plaintiff's replacement is, like Lehmann, a member of the protected class does not prevent this inference from being drawn; rather, the critical issue is whether the replacement worker is considerably younger than the plaintiff. *See id.* I note that although the record would be insufficient to prove discrimination at the third stage of the *McDonnell Douglas* analysis – particularly in light of the age of the supervisor who immediately assumed David's responsibilities after her termination and the factual questions concerning whether Lehmann in fact replaced her – David has satisfied the *de minimis* burden of clearing the first stage of that analysis. *See e.g., Taylor v. Local 32E Service Employees Int'l Union,* 286 F. Supp.2d 246, 252 (S.D.N.Y. 2003).

Because David has established a *prima facie* case, the burden of production shifts to the defendants to "articulate a legitimate, clear, specific, and non-discriminatory reason" for David's termination. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) (citation omitted). The defendants have done so. They claim that David was terminated as part of a financial restructuring that the company undertook to reduce costs and streamline operations in July, 2002, after the company, which was already suffering from lagging sales, lost its bid for a major

---

Ciringione Dep. 21-22, 33. That Henderson on occasion performed buying tasks does not support David's position that he replaced her. I need not decide whether, but for the timing issue noted above, I would find Henderson's duties to have been so dissimilar from David's as to make it impossible for a jury to find as a matter of fact that their jobs were the same for purposes of the ADEA.

contract from Honeywell. Konopelko, Compitello, Berlinghorf, and Ciringione all testified about Comtech's reorganization initiative and noted that with respect to the purchasing department they sought both to automate certain processes through the increased use of computers and to reduce the total number of employees by making each responsible for a wider array of duties. In particular, they all testified that the positions held by David and Bantleon were essentially phased out, and that Ciringione assumed responsibility for their work in addition to his own responsibilities. *See* Konopelko Aff. ¶¶ 8, 10; Compitello Aff. I ¶¶ 19-22; Berlinghorf Dep. at 25; Ciringione Dep. at 14, 17, 19.

The defendants also claim that Lehmann's hire was consistent with its reorganization plan because he was hired to fill a variety of positions and had significant computer experience. Lehmann testified that he was hired to perform buying, expediting, and planning tasks, and that shortly after he was hired as a permanent employee, he brought his computer expertise to bear on the purchasing department by automating the buying process. According to Lehmann, using the computerized process he developed for sending automatically generated quotes to vendors via email, he can now generate purchase orders more than twice as fast as when the orders were being completed by hand. Lehmann Dep. at 44-48, 50.

David does not dispute that the purchasing department automated several processes under Lehmann's lead, but she argues that his performance and the changes made in the department subsequent to her termination cannot be used as evidence of a nondiscriminatory rationale for firing her. David Stmt. ¶¶ 29, 30; David Memo. at 8. While I agree that Lehmann's job performance and skills say nothing about the defendants' rationale for firing David some four months before Lehmann was hired, I do find that Lehmann's testimony along with other evidence

of the variety of tasks he performed and his role in computerizing the purchasing department support the defendants' claimed reorganization and is also relevant with respect to their claim that Lehmannn was not hired to replace David.

The defendants have adequately met their burden of articulating a legitimate, nondiscriminatory rationale for their conduct. The claimed reorganization is a "clear [and] specific reason" for David's termination. *Schnabel v. Abramson,* 232 F.3d 83, 88 (2d Cir. 2000). "[T]aken as true, [it] would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Having met the requirement of the second step of the *McDonnell Douglas* analysis, the defendants need do nothing more – in particular, they need not disprove that they discriminated against David. It is instead David who must establish that the defendants' cited rationale was actually a pretext and that her discharge was instead at least partially motivated by her age. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 136 (2d Cir. 2000). Her burden is thus not only to prove that the defendants' purported reason for terminating her is false, but also affirmatively to establish that her age was a factor in her termination. *See Hicks*, 509 U.S. at 519; *Schnabel*, 232 F.3d at 88 (plaintiff's burden is to "present[] sufficient evidence for a reasonable jury to conclude that [defendants] discriminated against him because of his age") (citation and internal quotation marks omitted).

David seeks to disprove the defendants' rationale by pointing to some of Comtech's financial records that, she argues, counter its claim of disappointing sales and thus also its asserted need to reduce costs and restructure its organization. Specifically, David cites Comtech's annual reports for the fiscal year preceding her termination (2002) and the year in

which she was fired (2003). The fiscal year 2002 annual report cites $22.8 million in sales, which is described as a 39 percent increase from the prior year. Slavin Aff. I Ex. K at 15. Regardless of the accuracy of the latter statistics, there is no dispute that Comtech's sales were below the $30 million benchmark that David concedes the company had hoped to attain after it purchased MPD's assets. *See* David Stmt. ¶ 14. Thus, even if the annual reports paint a rosier financial picture than the defendants would now have me see, the evidence on which David relies cannot suffice to demonstrate that the defendants' explanation is pretextual.

The same kind of problem undercuts David's similar reliance on the proposition that a CTC subsidiary other than Comtech was affected by the terrorist attacks of September 11. David Memo. at 12 (citing CTC's 2002 annual report). While the evidence does suggest that another subsidiary suffered a loss as a result of the attacks, David concedes that Comtech implemented a reduction in force in November, 2001, and she points to no specific evidence to counter Konopelko's testimony that a downturn in sales prompted that layoff. David Stmt. ¶ 16.

David's attempt to prove affirmative discrimination fares no better than her attempt to disprove the defendants' explanation. She notes only that the majority of the employees terminated pursuant to the defendants' purported reorganization plan were within the protected class. David Memo. at 9. Even if true, the proposition does nothing to prove discriminatory intent because David has not introduced any evidence concerning the age distribution of all of Comtech's employees. Without such evidence, or some other comparable measure, the number of fired employees within the protected class does not permit any inference about whether such employees were any more likely than their younger colleagues to be terminated.

Although none of David's explicit arguments suffices to withstand summary judgment, my task is to assess the state of the underlying record, and to determine whether it would permit a rational jury, consistent with the legal instruction it would receive, to make findings of fact that support David's claim. *See* Fed. R. Civ. P. 56(c). If I am aware of a basis for determining that the record would permit such findings, the law does not require me to ignore it simply because David has not been the one to bring it to my attention. And the record in this case does indeed suggest a reason for denying summary judgment on the ADEA claims.

Specifically, a jury could find that the evidence David has introduced to prove that Comtech replaced her with the considerably younger Lehmannn may also demonstrate that the defendants' explanation for her termination was a mere pretext to age discrimination. To the extent that the jury finds that Lehmannn was hired to fill a position that is functionally the same as David's, there would be reason to doubt that the defendants phased out David's position as part of their reorganization. Moreover, the record suggests that after Comtech's sales picked up a mere four months after David was fired and the need arose for an additional buyer in the purchasing department, the defendants never considered rehiring David despite the positive reviews she received and her improving computer skills. *See* Ciringione Dep. at 29-30. The defendants have not explained why they did not considering rehiring David for the position Lehmann was ultimately hired for, which can itself serve as evidence of pretext. *See Carlton v. Mystic Transportation*, 202 F.3d 129, 136 (2d Cir. 2000) (finding defendant's failure to explain why it did not rehire older employee terminated as part of a reduction in force after a new account generated revenue to hire an employee in the terminated employee's position was evidence of pretext).

Based on the foregoing, I find that the record raises a genuine question of fact as to whether "the asserted pretextual reasons were intended to mask age discrimination" to defeat the defendants' motion. *Schnabel*, 232 F.3d 83, 88 (2d Cir. 2000). A plaintiff's *prima facie* case combined with evidence of pretext "'*may* permit' a trier of fact to conclude that a plaintiff ha[s] met his ultimate burden." *Id.* at 90 (quoting *Reeves*, 120 S.Ct. at 2108-2109). Whether it does is a case-specific question that depends on such factors as "the strength of the plaintiff's *prima facie* case" and "the probative value of the proof that the employer's explanation is false." *Id.* David has introduced sufficient evidence of circumstantial evidence of discrimination and the pretext of the defendants' non-discriminatory justification for its conduct to meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her." *Reeves*, 120 S.Ct. at 2106 (quoting *Burdin*e, 450 U.S. at 253). Whether David's termination and Lehmann's hire were in fact done in accordance with a reorganization effort or whether David was fired in part to make way for younger employees is a question of fact for the jury. I therefore deny the defendants' motion for summary judgment on David's age discrimination claims.

3.   The Title VII Gender Discrimination Claims

David asserts two separate theories of gender discrimination: first, that she was replaced by two male employees; and second, that she was paid less than male employees. I analyze both theories according to the same burden-shifting analysis as her ADEA claims. As a female, David is a member of a protected class under Title VII and, as already noted, the defendants concede that she was qualified for her position. The ultimate issue with respect to each claim is thus whether David's gender motivated the defendants' decision to terminate her.

With respect to the first claim, I find that David has failed to establish that the circumstances of her firing raise an inference of gender discrimination sufficient to establish a *prima facie* case. On the same day that David was fired, Comtech also fired Bantleon, a male buyer. Thus, even though, as discussed above, David has raised a question of fact as to whether she was thereafter replaced by Lehmann, who in addition to being younger is also a male, any inference of discrimination raised on the basis of his gender is defeated by the fact that Bantleon was also fired on the same day. David has introduced no other evidence to suggest that her gender was a factor in her termination. Thus, even if I did find that David has established a *prima facie* case of gender discrimination, this would be insufficient to defeat the defendants' motion since she has not created a question of fact on the ultimate issue of discriminatory intent.

David's second Title VII claim is that she was paid less than the two male buyers, Balfoort and Bantleon. To state a *prima facie* claim of pay disparity under Title VII, David must show that she was paid less than those not in her protected class (men) for equal work, and she must in addition produce evidence of "discriminatory animus." *See Belfi v. Pendergast*, 191 F.3d 129, 139 (2d Cir. 1999) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998)). David seeks to meet this burden through the employees' respective salary histories, which establish that she was paid less than each of her male colleagues. The defendants argue that neither of the male employees to whom David compares herself was sufficiently similarly situated to her. Comtech Reply at 10-12.

The documentary evidence establishes that Bantleon and Balfoort were each paid more than David. During Balfoort's last year as a buyer, which preceded David's hire by two years, he

was paid $14.49. Compitello Aff. I Ex. K. That amount is 49 cents more per hour than David was paid when she was initially hired as a buyer. Compitello Aff. I Ex. I. Bantleon was hired as a "Mechanical Buyer" at a starting wage of $17.125, which is approximately 22 percent higher than David's $14 per hour starting salary. David's salary remained lower than Bantleon's from his hire until the day they were both fired. *Id.* David further notes that the other female buyer, Sharon Marcus, was paid a starting salary of $14 per hour in 1997. Slavin Aff. I Ex. H.

A plaintiff claiming disparate treatment must rely on a comparison with others who are "similarly situated in all material respects." *See Graham v. Long Island R. R.,* 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir. 1997)). For example, they must hold the same position and report to the same supervisor. *Id.* There is ample evidence that Bantleon and David both reported to Ciringione and that they were both buyers. *See* Ciringione Dep. at 32; David Dep at 57-59; David Aff. ¶ 7; Compitello Aff. I ¶ 14. The question thus becomes whether that level of similarity is enough.

The defendants devote considerable energy to the ultimately fruitless task of trying to prove that each of the male buyers' position was too unique to be considered similar to David's for purposes of a disparate pay claim. First, the defendants argue that Balfoort was a senior buyer during the time that he and David both worked at Comtech. Assuming for the moment that it is true that the position of buyer and senior buyer are sufficiently different for purposes of this analysis, David compares her salary to that which Balfoort was paid two years before she was hired when he was a (non-senior) buyer.

With respect to Bantleon, the defendants argue that he was a mechanical buyer and Comtech's position descriptions conclusively demonstrate that a mechanical buyer uses different

skills than an electrical buyer. As noted, these job descriptions indicate that the positions are virtually identical and vary only with respect to the fact that the former position requires the interpretation of blueprints whereas the latter does not. Compitello Aff. I Ex. H. However, even if this difference is material, none of the documentary evidence suggests that David was hired exclusively to buy electronics parts, and her testimony that she purchased both types of parts rebuts Compitello's testimony to the contrary. Moreover, even if David was an electronics buyer and that position would normally be considered distinct from the job of mechanical buyer because the latter must interpret blueprints, David has testified that she occasionally *did* read blueprints. That would raise the possibility that, regardless of their respective titles, Bantleon's job and David's were not materially different in practice. That is a factual question that the jury must resolve. *See Graham*, 230 F.3d at 39. For present purposes, it suffices that David has produced evidence that would allow the jury to resolve it in her favor.

Of course, that is not all that David must do to establish a *prima facie* case of pay disparity under Title VII. She must also introduce evidence of discriminatory animus, which requires evidence beyond the mere fact of unequal pay for equal work. *See Belfi*, 191 F.3d at 140. On this score, David has failed to meet her burden. Moreover, even if the record sufficed for purposes of establishing a *prima facie* claim, the fact that the defendants have offered nondiscriminatory reasons for the wage disparity with respect to each male buyer that David has failed to counter with evidence of pretext would preclude judgment in her favor.

As an explanation for Balfoort's higher wage, the defendants note that he had been working at Comtech for five years and had received five annual merit raises before he made a higher wage as a buyer in 1993 than that which David made in 1996. With respect to Bantleon,

they argue that he was offered a starting wage of $17.125 to induce him to leave a job where he made $16.25 per hour. Comtech Reply at 11-12. These claims are supported by each employee's salary history and, in Bantleon's case, by his employment application. Compitello Aff. I Exs. F-G. The defendants have thus met their burden with respect to introduction of admissible evidence of a "clear, specific, and non-discriminatory reason" for the wage disparity. *Quarantino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir. 1989).

David makes two unsuccessful attempts to establish that the defendants' proffered reasons are pretextual. First, she incorrectly claims that neither of the proffered explanations justify the lower base salary that she was paid relative to Bantleon. David Memo. at 23-25. David next argues that she had superior qualifications relative to her male colleagues such as her twenty years experience in the industry and relevant course work. *Id.* (citing Slavin Aff. Ex. E (David's employment application); Compitello Aff. II Ex. A (David's resume); David Dep. at 5-44 (describing work and education history)). This assertion, even if true, does not undermine the defendants' explanation for the male buyers' wages. David has simply failed to introduce any evidence from which a trier of fact could conclude that the pay disparity resulted from discriminatory animus. Based on the foregoing, I grant the defendants' motion for summary judgment with respect to both of David's Title VII claims and the corresponding NYSHRL claims.

C.    The Equal Pay Act Claims

1.    Applicable Law

David's claims of having been unlawfully denied her right to equal pay regardless of sex also implicate a combination of two federal and state laws that are both more specific and more forgiving to the dearth of her evidence of animus than Title VII:  the federal Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"), and the New York Equal Pay Act, § 190 of the New York State Labor Law (the "state EPA").  The federal statute prohibits employers from paying higher wages to male employees than female employees for equal work.  *See* 29 U.S.C. 206(d)(1); *Ryduchowski v. Port Authority of New York and New Jersey,* 203 F.3d 135, 142 (2d Cir. 2000) (citing cases).  The New York state law equivalent provides the same protection and is governed by the same principles as its federal law counterpart.  *See Pfeiffer v. Lewis County*, 308 F. Supp.2d 88, 98 n.8 (N.D.N.Y. 2004) (citing *Kent v. The Papert Companies, Inc.*, 309 A.D.2d 234, 246 (N.Y. App. Div. 2003); *Mize v. State Div. of Human Rights*, 33 N.Y.2d 53, 56 (1973)).

Under both laws, the plaintiff bears the burden of establishing a *prima facie* case, which consists of the following elements:

(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions.

*Id.* (citation omitted).  Unlike Title VII, liability under the EPA is strict; the plaintiff need not prove that the employer intended to discriminate.  *Id.*  After the plaintiff establishes a *prima facie*

case, the burden of persuasion shifts to the employer to show that the wage differential is justified by one of the following four statutory exceptions:

> (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1); *see Corning Glass Works v. Brennan,* 417 U.S. 188, 196 (1974). The plaintiff can counter the employer's evidence on this score with her own evidence that "the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Ryduchowski*, 203 F.3d at 142 (quoting *Belfi v. Pendergast,* 191 F.3d 129, 136 (2d Cir. 1999)). "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices." *Belfi,* 191 F.3d at 136 (quoting *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986)).

## 2. Application Of The Law To The Record In This Case

Both sides assert that the equal pay claims can be resolved without trial. The defendants argue that David has failed to state a *prima facie* claim, while David argues that she has done so and that it is the defendants who have failed to establish a valid defense that overcomes their otherwise strict liability. I cannot entirely agree with either side: as explained below, I conclude that there are genuine disputes of material fact that require a jury to determine whether David's former job was sufficiently comparable to those held by her higher-paid co-workers and, if so, whether there were valid reasons for the difference.

In essence, the plaintiff's threshold burden with respect to an EPA claim is to introduce evidence of unequal pay for equal work. The applicable legal standards are the same as those

that govern pay disparity claims brought under Title VII except that an EPA claim does not require any showing of discriminatory intent. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir.1995). As discussed above, intent was the only element of David's Title VII pay disparity claim that she did not establish. With respect to the similarity of the positions of the male and female employees at issue, she introduced admissible evidence that her position was "'substantially equal' in skill, effort, and responsibility" to Bantleon's and to Balfoort's, at least with respect to the time period when the latter was a buyer if not necessarily after his promotion to senior buyer. *See Lavin-McEleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001) (quoting *Tomka*, 66 F.3d at 1310). With respect to the disproportionality of her compensation relative to that of her male co-workers, David has introduced salary histories maintained by Comtech for each of the buyers, which establish that during David's tenure in the purchasing department the two male buyers were paid more than the two female buyers. She has thus established a *prima facie* case under the EPA. *See Ottaviani v. State Univ. of New York at New Paltz,* 679 F. Supp. 288, 336 (S.D.N.Y. 1988).

The defendants therefore have the burden of proving that the disparity was justified by one of the EPA's affirmative defenses. Their burden on this score is one of persuasion, not merely production, and the burden is a "heavy one" – the statutory exceptions are to be "narrowly construed." *Ryduchowski*, 203 F.3d at 142 (citations omitted). The defendants first argue that Bantleon's higher wage resulted from market forces – specifically, his salary at the job he left to work at Comtech, which they argue was a factor in his starting wage. Comtech Memo. at 9. Next, the defendants argue that Comtech has a structured merit system that accounts for the fact

that David's starting salary was lower than Balfoort's salary during his final year as a buyer. Comtech Reply at 11.

The pressure of market forces is a recognized "factor[] other than sex" that constitutes an affirmative defense to an EPA claim. *See Ottaviani,* 679 F. Supp. 338 (citing *Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980)). The market forces that the defendants claim were at work with respect to Bantleon were the wage that he had been earning at the job he left to work for Comtech and his background and experience that the defendants claim justified the wage they paid him. Necessary inducement to hire the best candidate and background experience are also legitimate "other than sex" explanations for pay differentials under the EPA. *See Ottaviani,* 679 F. Supp. at 338 (citations omitted).

The evidence in support of the defendants' claim that it was necessary to offer Bantleon $17.25 in order to induce him to leave another employer and join Comtech consists of Compitello's sworn affidavit asserting this to be true and Bantleon's employment application in which he reported that he was then making $16.25 per hour as a Senior Buyer at Sonicor Instrument. Compitello Aff. I ¶ 14, Ex. G. Although David has not offered any contrary evidence, I find that the defendants' evidence by itself is insufficient to meet their "heavy burden." *See Ryduchowski*, 203 F.3d at 143 (citations omitted). Compitello's conclusory statement does not indicate whether there were other available and qualified candidates who would have worked for less than Bantleon, or even whose idea it was to offer him the higher wage rather than try to lure him to Comtech on the basis of factors other than higher pay.

With respect to the defendants' claim that Bantleon's background and experience justified his salary, I note that David's own work history, which is similar in many regards to Bantleon's,

raises a question of fact as to whether the defendants reasonably used this as a factor "in light of the employer's stated purpose as well as its other practices." *Belfi v. Pendergast,* 191 F.3d 129, 136 (2d Cir. 1999) (quoting *Maxwell v. City of Tucson* 803 F.2d 444, 446 (9th Cir. 1986)). Compitello testified that starting salaries were based on "what [individuals] bring to the job and their background." Compitello Dep. at 40. In her affidavit, Compitello stated that David's salary was based on her experience and the salary that she was earning at the time. *Id.* ¶ 11. Each employee's resume lists more than twenty years of experience in numerous buying positions. David's resume lists seven different nearly successive "Buyer" positions stemming back to December, 1981. Compitello Aff. II Ex. A. Bantleon's resume similarly lists various purchasing positions dating back to November 1984. Compitello Aff. II Ex. B. The defendants correctly note that Bantleon had previously worked as a "Senior Buyer" whereas David had not, and that Bantleon had an Associate's Degree in Business Administration whereas David did not have a post-secondary degree. These differences alone do not conclusively establish that Bantleon's salary was reasonably based on his background and experience given David's own extensive work history and the fact that she had previously made $15.00 per hour. Slavin Aff. Ex. E. Whether the defendants reasonably considered Bantleon's background or whether this is a pretext for discrimination is a question of fact that should not be resolved at this stage.

Likewise, I find that questions of fact exist with respect to the merit system defense raised by the defendants with regard to Balfoort. They claim that Balfoort's hourly wage of $14.45 when he was a buyer in 1994 was the result of Comtech's merit pay system, pursuant to which Balfoort had received eight separate annual raises. Comtech Reply at 11 (citing Balfoort salary history). David counters that the defendants have failed to establish a valid merit system defense.

I agree. To serve as the basis for a defense to a *prima facie* violation of the EPA, the system in question "must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria." *Ryduchowski,* 203 F.3d 135, 142-143 (2d Cir. 2000) (quoting *E.E.O.C. v. Aetna Ins. Co.,* 616 F.2d 719, 725 (4th Cir. 1980)). As evidence of its merit pay system, the defendants have introduced an affidavit from Compitello explaining generally how the merit system operates, copies of David's April 2002 performance review, and David and Bantleon's salary histories, which the defendants argue establish that each employee received annual raises pursuant to the alleged merit system. Also in the record are David's annual performance reviews for 1997-2001. Slavin Aff. I Ex. F.

Compitello testified that David received performance reviews on the same "basis and schedule" as all other Comtech employees. Compitello explained that Comtech employees are rated on several different categories and also given an overall performance rating that, in conjunction with the employee's current salary, determines the employee's annual raise. According to Compitello, each employee's current salary is taken into account in the following way: Each employment category has a pre-established rate range that is divided into quartiles and employees in lower quartiles receive a higher percentage point raise than individuals in higher quartiles with the same performance rating. Compitello Aff. I ¶ 13. David's performance reviews generally support Compitello's testimony. Each of David's five annual performance reviews was conducted on an identical form, suggesting that she was systematically evaluated on predetermined criteria. Moreover, each performance review contains an overall performance rating and is accompanied by a form titled "Employee Status Change" that notes the percentage increase and the pre- and post-raise quartile into which David's salary fell. Slavin Aff. I Ex. F.

However, the defendants have provided no evidence that other employees were evaluated in the same manner as David and that Comtech employees generally were aware of the merit system. *See Ryduchowski,* 203 F.3d at 143; *Hernandez v. Kellwood Co.*, 2003 WL 22309326, *11 (S.DN.Y. 2003) (finding that defendant failed to establish the existence of a valid merit system in part because the defendant failed to introduce evidence that all employees were evaluated in a manner similar to plaintiff). While the salary histories suggest that each employee received an annual merit increase, I find they are not sufficient for me to take the factual question away from a jury and decide as a matter of law that Comtech had merit pay system for purposes of the EPA.

There is no question that David got paid less than the male colleagues to whom she compares herself. There are genuine questions of material fact, however, as to whether those colleagues are sufficiently comparable and whether, if they are, there was a permissible reason for the differential. As a result, I must deny each party's motion for summary judgment on David's EPA claims.

III.    Conclusion

For the reasons set forth above, I grant the defendants' motion for summary judgment with respect to David's claims of gender discrimination under Title VII and New York State Human Rights Law, deny the remainder of their motion, and deny David's cross-motion for summary judgment on her EPA claims.

    **SO ORDERED.**

Dated: Brooklyn, New York
        September 22, 2006

                                        /s/ James Orenstein
                                        JAMES ORENSTEIN
                                        U.S. Magistrate Judge